Mr. Chief Justice Shakkey
delivered the opinion of the court.
The question in this case is, whether notice to the indorser of a promissory note, who was, at the time of protest, a member of the United States senate, from Mississippi, is sufficient to fix his liability, under the circumstances of the case, if it were sent to Washington city, where the defendant then was, attending the session of congress.
This case was before this court in 1839, on an appeal taken by the defendant below, and the judgment was reversed. On *648 the second trial, the defendant succeeded, and the plaintiff having moved for a new trial, now brings up the case by appeal. Previous to the second trial, the plaintiff amended his declaration by adding a count, in which he states as an excuse for not giving notice, that the defendant had no residence or place of business. The questions then are, first, does the present record so vary the aspect of the case, as to make the notice which was sent to Washington city sufficient? and second, does the proof entitle the plaintiff to recover under his amended declaration, although no notice was sent?
1. I have carefully compared the present record' with that on which the case was previously decided; that comparison leaves the conclusion that there is a material difference in the aspect of the two cases. Whether that difference is sufficient to justify us in sustaining the notice in the present case, will* be shown in the sequel.
/ The question as to Walker’s residence, is the disputed point, and the one on which the case must turn. Notice must be served personally, or it must be left at, or sent to the party’s residence or place of business. If the residence of the indorser be unknown, then due diligence must be used to ascertain it, and if after such diligence it cannot be found out, the want of notice will be excused. Chitty on bills, (Barbour’s Ed.) 486. 7 Bailey on Bills, 280. The law requires that the indorser should have notice in order that he may protect himself against loss. His undertaking is that he will pay if the maker does not, provided he is duly informed of the non-payment. But whilst the holder is bound to give notice if he can, he is not to lose his remedy if he cannot do so, provided he uses reasonable diligence to discover the residence of the indorser, tie must not remain in a state of contented ignorance. Notice to the indorser, or due diligence to give it, being conditions precedent to the holder’s right of recovery; he must come prepared to prove that he has given or sent notice to the proper place through a proper conveyance. Or if such notice has not been given, then he must prove circumstances which will in law amount to a good excuse for his having failed to do so, and then he will have a *649 right to recover. When the holder does not know the residence of the indorser, why is it that he is required to use proper diligence to find it out ? Because the law presumes that every man has a residence or place of business, and that it may be ascertained by diligent inquiry, and that the indorser may be thus protected by notice, which protection the holder is bound to afford him if he can. It is for the benefit of the indorser, and not an unmeaning, useless requisition. When the holder proves that he endeavored to find out the indorser’s residence, but could not, he is entitled to recover, even without any no-A" tice. But suppose the indorser has no residence or place of business, and the plaintiff proves that fact, is he then also required to prove diligence in trying to find out that which he proves did not exist? and therefore could not be found with ever so great a diligence. The law surely requires no such idle ceremony. (Then I conclude that if a holder proves diligence in trying to ascertain where the residence of the indorser was, and fails, that he is excused for not having given notice •) and if he proves that the party had no residence or place of business, then he will be excused for not having used diligence to find out such residence. The reason for requiring diligence then fails, and in such case notice sent to the place where the party is known to be, is the best and only notice which can be given. This accords with the doctrine laid down by Judged Story, who says, “In cases where the residence of the parties who are to receive notice, is unknown, it is incumbent upon the holder, and all other parties who are required to give notice, to make due inquiries with reasonable diligence as to the true domicil and place of business of the party; and unless they do so, those parties will be discharged, if, upon the exercise of due diligence, their places of domicil and business could have been ascertained.” Story on Bills, 334, sec. 299. But what if their places of domicil could not have been ascertained ? In such cases, the author leaves the conclusion or inference that diligence will be dispensed with. This is the necessary consequence, and indeedit is implied in the text. \We have also\ asserted the same principle in the- former decision of this case, *650 3 Howard, 264. Indeed this must be the rule of law, for it is impossible to send notice to the domicil of a party who has none, and it would be absurd to require a party to prove that he diligently tried to find that which he proves had no existence. This being the law then, let us see what the facts are to which it is to be applied. The evidence is lengthy, and I shall endeavor to extract the substance without giving it in detail.
The record of the notary was first read, which shows that the note was protested on the 4th of February, 1837, and that notice was put in the post-office in time to go out by the first mail of the day next succeeding the protest, addressed to R. J. Walker, at Washington City, District of Columbia.
The deposition of John Black was then read, which states that on the 1st February, 1837, Robert J. Walker was a member of the Senate of the United States, and was then, and up to and after the 4th of March, boarding in Washington City, his family being also there. That Mr. Walker, during the winter, and up to the 4th of March, was in the habit of receiving his letters through the post-office at Washington, which were delivered to him by the proper officer of the house of which he was a member, as is the custom. Mr. Walker had once resided in Natchez, but a year or more before his election, in 1835 or ’36, he moved to Madison county, the precise time not known. He did not know where Mr. Walker resided in Mississippi at the time mentioned, but thought he had sold out, and left Madison county; and the witness did not know that he had any fixed residence in Mississippi, but that his last place of residence was Madison county.
Haliday was then introduced as a witness • who stated that defendant told him in 1835, that he had removed to Madison county, and caused an advertisement to be inserted in a newspaper, by which letters, &c. addressed to R. J. Walker, were directed to be forwarded to him, at Pearl Dale, near Madison-ville, in Madison county, Mississippi, which advertisement was published six weeks in a paper having an extensive circulation, for which Cook, the notary, was a subscriber. The witness had conferred frequently with the defendant at Pearl Dale, from *651 Natchez, in 1835, and knew of no change of residence by said defendant in 1837.
J. F. H. Clairborne was then introduced. He states that Mr. Walker, in 1833, declared his intention of selling in Madison county, and in 1834 or ’35, he bought a plantation near Madison-ville, and called it Pearl Dale, to which he removed in. 1835, and his family remained there until 1836, when defendant was elected to the Senate, and left the state to attend to his duties, leaving an overseer on the place, who remained until G. R. Fall purchased it of defendant; in the sale defendant reserved the residence and some land, and on being upbraided by the witness for selling, Mr. Walker assured him that he had no thought of changing his residence, but that he intended to retain some of the land and improve it, and remain permanent. That when Mr. Walker arrived at Washington City, he gave his residence to a publisher of a congressional register as from Madisonville, and witness testified to two such books published in 1836, 1837 and 1838, in which Madisonville is given as the place of Mr. Walker’s residence. Mr. Walker requested the witness to send him public documents at Madisonville, and he also gave'the witness permission to take his papers and public documents out of the post-office at that place, which he sometimes did, taking at one time nearly a cart-load. Mr. Walker did not stay at Pearl Dale during the summer of 1836, but once visited there, having returned to the state after the recess of Congress of that year. He was in the state but a short time during that summer. George R. Fall took possession of Pearl Dale, under his, purchase, in 1836, but did not reside there until the fall of 1837. The witness does not know that Mr. Walker visited Pearl Dale in 1837, but knows that he did not live there with his family, Mrs. Walker having remained in Natchez during that summer. In 1838, Dr. Pucket purchased Pearl Dale of Mr. Fall, and required that Mr. Walker should relinquish his reservation, which he consented to. Madisonville is the nearest post-office to Pearl Dale. The witness knew of no change of Mr. Walker’s residence from Madison county in February, 1837.
Isaac McFarren stated that defendant purchased Pearl Dale in 1835, and removed there with his family, and remained *652 there until after he was elected, but that he has not heard of either defendant or his family being there since January, 1836. He thought if defendant had changed his residence he would have known it. Defendant claimed Pearl Dale as his residence until 1838, but he did not spend any part of the summer of 1836 there. That in the sale to Fall, the defendant reserved the residence. He knew of no change in defendant’s residence in February, 1837. Neither the defendant nor his family visited Pearl Dale during the summer of 1837, Mr. Walker having been part of that summer in Natchez, and part of it absent from the state.
The written contract of reservation was then read, which seems to have been a supplemental agreement entered into by Walker and Fall after the sale of the plantation. It is dated 5th of May, 1836, and recites that defendant was then engaged in repairing the dwelling, which he had that day contracted to sell, and that the repairs were expected to be completed that autumn at his expense, and that as he was still desirous of retaining and continuing his residence at Pearl Dale, therefore, “ it was agreed that said Walker might occupy said house free of rent during the recess of congress, for a period not exceeding the fall of 1838, say 15th of November, 1838, and that said Walker might at any time within that period, select a quantity of land in one body, not exceeding thirty acres, out of said Pearl Dale place, and near said house and residence.” Of the land so selected, Walker was to be the proprietor in fee simple, allowing Fall a deduction of thirty-five dollars per acre, to bé deducted out of the purchase money, and in case of disagreement as to the location, it was to be made by a third person.
E. G. Howell’s statement was then read. He saw the advertisement before alluded to, and in January, 1836, he rented Mr. Walker’s house, in Natchez, and purchased some of his furniture. Subsequent to that time, Mr. Walker had been his guest at various times, and he was not aware that he had a residence in the state other than the one claimed by him in Madison county. He did not believe that Mr. Walker had resided in Madison county at any time since February, 1837, if by “ residing ” was meant the occupation of a house; that Madison county was his last known place of residence to the witness. Since February, 1837, *653 Mr. Walker and family, when in the state, had generally been guests in bis house, and were so a part of the summer of 1837. That he did not know any facts indicating an abandonment of Mr. Walker’s residence in February, 1837.
The statement of G. R. Fall was read, in which he states that he recollected the reservation before alluded to, and the circumstances attending it, that Walker insisted on reserving a residence.
A deed from Dr. Gwin, to Mr. Walker, of certain land therein described, dated in December, 1S36, in which Mr. Walker is described as a citizen of Madison county, was also read.
Benjamin Williams was also examined, and stated the purchase of Pearl Dale, by Mr. Walker,, and his removal there, and that he remained until 1836, very much as stated by the other witnesses. That in 1836 Mr. Walker left the slaves and place in charge of the witness, as agent, for various purposes connected with the,plantation; that he attended to various improvements, and other matters connected with the place. In 183Q, after Mr. Walker’s election, just before his departure, he gave the witness directions to have the house enlarged, which he 'did. The improvements were finished in October, and Mr. Walker paid the bills. That the witness-knew, that up to the 4th of February, 1837, Mr. Walker directed his letters and papers to be sent to Madisonville; that they continued to come there from 1835, until after February, 1837, and that he knew of no change of residence up to February, 1837; that the witness was the maker of the note, and when the note was protested, in 1837, he had a large property in his possession, worth $27,000, nearly all paid for, and then but few judgments against him, but it was all taken by subsequent judgments. If suit had been brought against him, in the spring of 1837, the money could have been made out of his property, and that Mr. Walker is a mere accommodation indorser. In the summer of 1836, Mr. Fall called on the witness, as Mr. Walker’s agent, to deliver up the place, which he did on seeing the contract of sale, and Fall then took possession of the place and slaves, but *654 not the house ; witness married in Adams county, in November, 1836, and resided there until April, 1837, but was in Madison-ville three times during that period. He had no knowledge that Mr. Walker had been at Pearl Dale, any time during 1837. He frequently saw letters and papers in the post-office there, directed to Mr. Walker, but knew of no one who was authorized to take them out; when Mr. Walker first saw witness, after the delivery to FaII, he complained at him, for having delivered the house, saying, “ that it ought not to have been delivered, but the plantation and slaves only.”
Mr. Barnard states, that he was the partner of the defendant in land purchases, and intimate with his business. Knows of his removal to Madison, in 1835, and knows of no change of residence in February, 1837. Witness lived in Natchez, and Cook, the notary, knew his intimacy with the defendant, and Cook also knew, that Howell, defendant’s relative, also lived in Natchez.
Withers, the deputy-sheriff of Adams county, testified, that in the spring of 1837, several executions against Williams, (the witness) amounting to about $12,000, were sent from Madison county, which were levied on all the property of Williams, in Adams county, but it did not bring enough to satisfy them.
From this evidence, it is plain enough, that Mr. Walker had a residence in Madison county, from 1834, or 5, until some time after his election, in 1836. Did he lose or abandon that residence, during that year, by the sale of his plantation to Colonel Fall 1 The witnesses say, they know of no change of residence before February, 1837. This does not prove that there was no change, but only that they did not know of it; and although they may have been uninformed of the change, other facts may prove it conclusively. The sale of the plantation was undoubtedly an abandonment of his residence, unless it is saved by the reservation. The contract of reservation is before us, and explains the nature and extent of the reserve. There was no right of soil reserved. There was, it is true, a right reserved, to select a spot of thirty acres, which Mr. Walker *655 was to have by paying for itj but this selection never was made, and it being a privilege which might be claimed or not, no right of soil vested under it. Mr: Fall had no claim on Mr. Walker, for the purchase-money, until the spot was selected; for he had the privilege of taking any number of acres under thirty. Then was he entitle.d 'to such use of the dwelling-house, as to entitle it to be called his residence ? The language of the agreement is this: “ It -is agreed that said Walker may occupy said house, free of rent, during the recess of congress, for a period not exceeding the fall of 1838.” Now this, at most, is only an agreement for a temporary occupancy, a,t particular times. No right of property is spoken of, but a bare permission to occupy the house, during the recess of congress. At all other times Fall, as the owner of the land, had a right to use and occupy the house. The notice was sent to the defendant during the sitting of congress, a time when, by the contract, he had no right whatever to the possession of the house. In addition to which, Williams testifies, that in 1836, he, as the agent of Walker, delivered to Mr. Fall the plantation and slaves; when Mr. Walker first saw the witness afterwards, he complained, and said, “ that the house ought not to have been delivered, but the land and slaves only.” The house must, then, have been delivered, or Mr. Walker could not have complained. The inference is irresis'tible, that Mr. Fall had taken possession of the whole. His right of property is clear, and he had actual possession.
In addition to this, it is in proof, that Mr. Walker was never at Madisonville but once, after the sale, and then on a visit; and that his family were never there afterwards, although both he and they were in the state, in 1836 and 37. So that it seems he never claimed his right to occupy the dwelling, in the recess of congress.
Mr. Howell states, that Mr. Walker, when in the state, generally staid at his house, and that he did not, after February, 1837, occupy a house in Madison county, though that was his last known place of residence to the witness. After the sale, none of the witnesses speak of Mr. Walker’s having any mem *656 ber of his family, or any agent, or servant, at the dwelling, or on the plantation, nor does it appear that he had any species of property whatever there. He had moved there, with a view, no doubt, to a permanent location; and to my mind, this circumstance explains much of the testimony, which seems to tend to establish that as his place of residence at the time of the protest; for instance, the entries in the Congressional Registers, spoken of by Mr. Claiborne, and his direction to that gentleman to- send him public documents there. These entries may have been made, and directions given, at a time when that was really Mr. Walker’s residence. Much of the testimony, indeed, seems to have been intended to establish the fact, that Mr. Walker did once reside in Madisonville ; but we must come down to the date of the protest, and ascertain whether he then lived there, or had a residence there. A careful review of all the evidence has left the conclusion on my mind, that at the time of the protest, Mr. Walker had not a residence in Madison county, to which the holder was bound to send notice. A member of congress, or other public officer, does not lose his residence, by absence in the discharge of his duties; nor does a private citizen, by temporary absence ; and the presumption of law is in favor of the continuance of a residence once established. But the sale of a man’s house is evidence of an intentional abandonment of his domicil.
The sale, in this instance, if it had been entirely unqualified, would have been considered by every one as such an abandonment. This is admitted by the effort to establish the reservation, which, when examined, must fall short of the object which is designed to be accomplished by it. It is a mere permission to occupy, during the recess of congress, but at no other time, which right of occupancy never was asserted. And moreover, the note was protested at a time when that right of occupancy did not exist — when the possession of the place was rightfully in another. If the notice had been sent, even by a special messenger, to Pearl Dale, it must have fallen into the hands of Colonel Fall, who was then the rightful and only occupant of the place. Sending notice to Washington city, *657 then, was the best notice which the party could have given.
At this point I will endeavor to draw the contrast between the case presented by this record, and that reported in 3 How, 259. In that decision, after suming up the substance of the proof, the court said, “This testimony, although not positive, is sufficient to raise a fair presumption that Walker was, at the time of the protest, still a citizen of Madison county. It is certain that he had resided there nine months previous, and it is not certain that he had changed his residence. He had only sold part of his plantation, and whether the part sold included his residence or not, the witness did not know.” This presumption that he was still a citizen of Madison county, was the hinge on which the whole case turned. Now we have accumulated proof which destroys that presumption, and leads to the conclusion that he did not hold a residence there at the time of the protest.
But the record shows additional reasons which operate powerfully in sustaining the notice. It is often the case that notice sent to either one of two places will be sufficient. Bank of Columbia v. Lawrence, 1 Peters, 578. It may be so here. The notice might have been g;ood if sent to Madisonville, as the last place of residence of Mr. Walker. “ It is not indispensable that the notice should be sent to the residence of the party, nor even to the town in which 'he_ resides. It is sufficient if it be sent to the office to which he usually resorts for his letters, and where he would probably receive it as soon as at the office nearer to him.” Bank of Geneva v. Howtell, 4 Wend. 328. 16 J. R. 218. Now although Mr. Walker was but temporarily absent, yet it is in proof that whilst at Washington, he was in the habit of receiving his letters through the post-office thgre, and it is also in proof that he was at Washington at the time of the protest, and at least until the 4th of March afterwards. The force of this rule must apply to him to some extent, and here I would also note a difference between this case and the previous one. The former record contained proof that he was at Washington *658 at the time of protest, but it contained no proof that he was in the habit of receiving his letters there. In Reed v. Payne, 16 Johns. Rep. 218, we find the reason of the rale above laid down, as well as the role itself. It is said that by requiring that notice should be sent to the post-ofiice nearest the party, it was intended that the notice should be useful in conveying information, and it was presumed the nearest post-office would best fulfil that object. With this reason in view, the court said, “If a notice be sent to the post-office to which the party usually resorts for his letters, it would admit of no doubt that such notice would be good, although it was in a different town from that in which he resided.” Now on the presumption that the law designed the notice to be useful to Mr. W alker, at which office was he most likely to receive that benefit, at Madisonville or Washington city? If it had been sent to Madisonville, it is positively certain that he would not have received it. Mr. Williams proves that there was no one there to take his letters out of the office, and so does Col. Claiborne. Judge Black proves that he was at that very period daily in the habit of receiving letters at Washington. Does the law require a notice to be sent to a place where it is positively certain it would not be received, and where the party is not, in preference to a place where the party is known to be, and at which there is every presumption that it will be received ? If it does, it cannot With truth be said that notice was designed for a useful purpose. What is the reason that the law requires a notice to be sent to the residence of an absent person ? It is because the law indulges a presumption that in that way he will be most likely to receive it; that he has left some one at home who will forward it, or an agent .. to attend to it But this presumption is rebutted here by proof, that Mr. Walker had no agent, or any one to take his letters out of the office. And here again I have to remark another difference between this and the case previously decided. In that, there was no proof whatever to remove the presumption that there was some one to attend to communications addressed to Mr. Walker, but in this there is such proof. So that under *659 the circumstances of this case, 1 cannot doubt that notice sent to Washington city was good, although it might have'been good if' it had been addressed to Madisonville.
Second. Does the proof entitle., the plaintiff to recover under his amended declaration, although no notice was sent 1 The preceding remarks leave but little to be said on this point. It^ would seem to follow as a consequence, that, if the indorser had no residence, and the holder is prepared to prove that fact, and the notice sent to the place where he is known to be, should be insufficient, then h^ must be entitled to recover without notice, [for I repeat that it cannot be necessary to prove diligence, when it is shown that such diligence would not have led to any useful result. í It is said the question of diligence does not arise}' except where the party knows or ought to know there is occa-^ sion for it. Bank of Utica v. Phillips, 3 Wend. 408. Now in this instance it seems that diligence would have proved unavailing, and why use it ? The proof of facts supersedes the necessity of proof of diligence. In an elementary writer the rule is clearly laid down, that “ if the house be locked up and no person there, in consequence of the temporary absence of the party, it is not necessary to leave a notice at the house, or to ascertain where he has gone to.”' Bailey on Bills, 273, 2d Am. ed. And this rule was fully recognised in Williams v. Bank of the United States, 2 Peters, 96. It is proven that Mr. Walker, even if he had a residence, was temporarily absent, and that there was no one at home, and according to the above rule notice was not necessary. The case would fall within the very letter of the above rule, but that there is no proof as to whether the house was locked or not. But surely if the holder is not bound to leave notice at a house which was locked, he cannot be bound to leave it at one which is unoccupied. This circumstance can make-no difference. So that if Mr. Walker N even had a residence in Madison county, the facts of the case, according to the authorities, furnish an excuse for a failure to give notice there.
It is insisted in argument that the advertisement of Mr. Walker, in 1835, that thereafter, papers and letters intended for *660 him, should be addressed to Madisonville, is conclusive against the sufficiency of this notice. That notice did not fix Mr. Walker’s residence for all time afterwards. It was a designation of his residence until he should change or abandon that residence. Now suppose that in 1836, Mr. Walker had removed to New Orleans, and that fact had been known to the plaintiff when the note was protested, can any one doubt but what he would have been bound to send notice there 1 Surely not. In the absence of such knowledge the advertisement might have justified the sending the notice to Madisonville. The language of the notice shows its object, and limits its duration. “Letters or papers intended for R. J. Walker, must be for-' warded to his residence at Pearl Dale, near Madisonville, Madison county, Mississippi.” Every one knows that letters are usually addressed to a man’s residence. The effect of this notice, and the object of it no doubt, was to let it be known where that residence was. That notice could only be regarded as a direction, so long as the residence continued. We are also admonished that an accommodation indorser is entitled to strict proof; that the case is a hard one on Mr. Walker, and that the facts were all before the jury, who were competent to pass upon them, and having done so, their verdict should not be disturbed. It is true that an indorser, and especially an accommodation indorser, is.entitled to strict proof; I think it has been made. I am aware that it is a hard case on Mr. Walker, but this cannot furnish an excuse for a departure from the law. It is true also that the facts were proper for a jury, and being so their verdict would not lightly be disturbed. But when it is apparent that the verdict is contrary to law and evidence, it is the duty of the court to interpose; otherwise the statute which authorizes either party to move for a new trial, and to spread the evidence on the record, and take an appeal if it be refused, would become a dead letter. On the whole, I think the verdict was manifestly against the evidence and should be set aside, and a new trial granted.
Mr. Justice Turner : I concur in the above opinion.